# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
April 16, 2013 Session

## STATE OF TENNESSEE v. MICHAEL JASON VANCE

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-64237     David Bragg, Judge**

---

**No. M2011-02469-CCA-R3-CD - Filed November 12, 2013**

---

Defendant, Michael Vance, was indicted by the Rutherford County Grand Jury for first degree premeditated murder, making a false report to a law enforcement officer, evading arrest, aggravated assault, unlawful possession of a deadly weapon, unlawful possession of a Schedule IV controlled substance, simple possession of marijuana, and possession of drug paraphernalia. The trial court severed counts 1, 2, 3, and 5 from counts 4, 6, 7, and 8, and upon the State's motion, the trial court subsequently dismissed with prejudice counts 6, 7, and 8 of the indictment. Defendant was convicted following a jury trial of first degree murder, making a false statement to a law enforcement officer, evading arrest, and unlawful possession of a deadly weapon. Following a sentencing hearing, the trial court sentenced Defendant to life imprisonment for felony murder, three years for making a false report, three years for evading arrest, and one year for unlawful possession of a weapon. Defendant's sentences in counts 2, 3, and 5 were ordered to run concurrently with each other and consecutively to his life sentence. In this direct appeal, Defendant raises the following issues for our review: 1) the trial court erred by denying Defendant's motion for judgment of acquittal; 2) the trial court erred by allowing into evidence the testimony of the victim's divorce attorney; 3) the trial court erred by allowing evidence of prior bad acts under Tennessee Rules of Evidence 404(b); 4) the trial court erred by limiting the testimony of the defense mental health expert, Dr. Lynn Zager; 5) the trial court erred by excluding the testimony of the defense mental health expert, Dr. Murray Smith; 6) the trial court erred by allowing the testimony of the State's mental health expert, Dr. Rokeya Farooque; 7) the trial court erred by allowing into evidence a photo of the victim taken while the victim was living; 8) the trial court erred by allowing into evidence autopsy photographs of the victim; 9) the trial court erred by allowing into evidence a durable power of attorney executed by the victim; 10) the trial court erred by not severing count 1 from the remaining counts; 11) the trial court erred by ordering consecutive sentencing; and 12) the evidence was insufficient to sustain Defendant's convictions. After a careful review of the record before us, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined. JAMES CURWOOD WITT, Jr., filed a concurring opinion.

Luke A. Evans, Heather G. Parker, and Bill Bullock, Murfreesboro, Tennessee, for the appellant, Michael Jason Vance.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Smith, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; Allen Hale, Assistant District Attorney General; and Jude Santana, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Facts**

Defendant's convictions stem from the February 28, 2008, shooting death of his wife, Suzanne Vance at the marital residence. Ms. Vance died from a single gunshot wound to the head. Defendant was arrested in possession of the murder weapon shortly after the shooting after he fled the scene. Defendant did not dispute at trial that he shot his wife. Defendant asserted at trial and in this appeal that he lacked the mental capacity to form the requisite intent for first degree murder.

Cindy Jarvis, the victim's mother, testified that the victim began dating Defendant at the age of 16 after her family moved to Rutherford County from Phoenix, Arizona in 1994. The victim began working at a McDonald's in Murfreesboro. The victim became pregnant, and the victim and Defendant had a daughter together in April, 1995. The victim and Defendant were married in December, 1997. Defendant and the victim had another child together in August, 1999. Ms. Jarvis testified that the victim and Defendant "never did get along. [The victim] would pack up and come home for a week or two. And then they would talk, and then she would go back. Then two or three months later, the same thing again." In 2004, after Ms. Jarvis had moved back to Phoenix, the victim with her two children left Defendant and moved to Phoenix. The victim did not tell Defendant she was leaving because Defendant had previously threatened the victim that "if she ever tried to leave him that she would find herself at the bottom of Percy Priest Lake." Ms. Jarvis confronted Defendant about whether he made that statement to the victim, and "he never answered outright. He just said, 'I never laid a hand on her.'"

On February 28, 2008, Ms. Jarvis was contacted by a detective and informed that her daughter had been killed. That morning, Ms. Jarvis received a call from Defendant on the victim's cell phone. Ms. Jarvis had plans to visit the victim the following day. Defendant told Ms. Jarvis that she needed to come sooner because "shit has done hit the fan." Defendant told her that the victim had "been seeing somebody else." Ms. Jarvis told Defendant that she was going to call the victim, and Defendant answered "all right [sic], bye."

In August, 2005, while the victim was living in Phoenix, Defendant filed a divorce action against her which was later dismissed. On February 9, 2007, the victim filed a divorce action against Defendant. The victim sought an order of protection against Defendant. In a supporting affidavit, the victim stated that on January 27, 2007, Defendant threw a cell phone at her and threatened to kill her. The *ex parte* order of protection was granted. A motion to set the final hearing in the divorce action was filed and served on Defendant on February 7, 2008. In January, 2008, the victim had begun working as a leasing agent at an apartment complex in Smyrna. She had also begun a romantic relationship with a coworker. They began dating around February 14, 2008. The victim intended to move into an apartment in the complex she managed on March 1, 2008. In February, 2008, she sold a diamond ring to pay for her move.

We will refer to the victim's children by their initials. The victim and Defendant's 15-year-old daughter, A.V., testified that her parents' fighting was a constant problem and that she did not remember an extended period of time when they did not fight. She testified that she remembered seeing a bruise on her mother's chest in 2007 that she believed was caused by their fighting but that she was not present when that particular fight occurred. She testified that she, her mother, and her brother would periodically move out of the home and later move back. On the day before the shooting, her parents were not speaking to each other. Defendant and the victim picked up A.V. and her brother, and they all went to a restaurant to eat. She testified that two nights prior to the shooting, she woke up "[a]fter midnight," and the lights would not turn on and "it was very cold in the house." She testified that both of her parents were not home. Defendant had requested that the utility company turn off the electricity in the home.

On the morning of February 28, 2008, Defendant drove A.V., her brother, and a friend of A.V.'s to school. A.V. testified that on the way to school, they heard a commercial for a dating service, and as she was getting out of the car, Defendant made the comment that he "was going to have to go find [her] a new mother."

Richard Tidwell, a neighbor, testified that he saw Defendant leave the residence to take the children to school. When Defendant returned, Mr. Tidwell observed him talking on

his phone while walking up and down the sidewalk from the driveway to the front of the house. Defendant went inside the residence and walked back out, and Mr. Tidwell saw him drive away in the victim's car. Mr. Tidwell testified that approximately 30 to 45 minutes later, he heard sirens and saw emergency personnel at the residence.

At 8:37 a.m., Defendant called 911 and reported that "[his] wife fell and hit her head, and is bleeding really bad." The operator gave "pre-arrival" instructions, and Defendant indicated that he was not at the residence, saying that he was "too far away." Defendant gave the dispatcher the victim's cell phone number but stated that he "doubt[ed] she would be able to answer it."

Betsy Lee, with the Murfreesboro Police and Fire dispatch, received a call from the Sheriff's department with a request that she dispatch first responders to the scene. When she entered the address into the system, she observed a "flag" on the address, indicating that officer safety issues existed, but no other specific information was provided. A subsequent search of the call history revealed a "weapons indication," which caused Ms. Lee to dispatch police to the residence.

David Simms, of the Murfreesboro Fire Department, responded to a call regarding a fall with head injuries at the victim's and Defendant's residence. Simms' unit arrived first at the scene by fire truck. When he opened the door to the residence, he saw "a lot of blood." He did not enter the residence because "it just did not look right." The EMS crew entered the house, and Simms called for the police. He then got a stretcher from the ambulance and his crew took it inside the residence. He testified that they "had to tip toe through all of the blood," and that "[i]t was the most blood [he had] ever seen." He testified there was blood on the floor and walls and "[t]he bed was soaked with blood." He went to the bathroom, where he saw the victim lying face down "behind the commode," and there was blood on the walls, the bathtub, and the floor. Simms testified that the victim was trying to talk to EMS staff, but Simms could not understand her. Simms did not learn that the victim had been shot until after he arrived at the residence.

Monica Fann, a Rutherford County paramedic, responded to a call that the victim had fallen. When she arrived at the victim's residence, the door was not latched. There was "a large puddle of blood" on the floor in the foyer. There was also blood smeared on the walls and "bloody footprints everywhere." Fann testified that "it looked like a slaughter house." Fann testified that she "knew that this was probably more than a fall" and that she "had a feeling [it] was a crime scene." She then heard the victim call for help. She and paramedic Jeremy Holmes made their way to the bathroom, where they found the victim lying on the floor. The victim appeared to have a gunshot wound to the left side of her face, which was swollen and disfigured. The victim told Spann her name, but she was unable to answer

-4-

Spann's questions and later became unresponsive. Spann found a second wound on the back of the victim's head, which corresponded with the wound on the victim's face and was presumably an entry or exit wound. The victim was transported by ambulance to Middle Tennessee Medical Center. The victim was pronounced dead in the emergency room of the hospital at 9:56 a.m.

Murfreesboro police officer Don Schubert arrived at the crime scene after paramedics. Officer Schubert testified that he saw a large pool of blood just inside the front door and a bullet fragment. He also observed eyeglasses, a driver's license, and a water bottle in the blood, and he found an unspent bullet beside the dresser in the master bedroom. Detective Katrina Henderson recovered two bullet fragments, one from the doorway between the foyer and den and the other from the hallway, and a .45 caliber unspent bullet from the master bedroom. Investigators also found an earring and a plastic bag containing marijuana in the large pool of blood in the hallway outside of the master bedroom.

Jerry Findley, a blood spatter expert, testified that the victim was shot in the foyer of the home, and she laid there for a period of time and was then dragged to the bedroom and into the bathroom. Mr. Findley observed finger impressions in the blood on the victim's clothes. Mr. Findley testified he "couldn't say for sure that [the victim] didn't move herself" to the edge of the carpet in the hallway from where she fell when she was shot, but he believed she was moved from that point into the bathroom by another person. Mr. Findley opined that Defendant picked the victim up and carried her into the bathroom. He testified that Defendant had blood transfer stains on the left arm of his jacket and only a small amount of blood on his shirt. He explained that if the victim's head was forward and Defendant grabbed her from behind to carry her, there would not have been a lot of blood transferred to Defendant's clothing. Mr. Findley based his opinion on photographs of the crime scene, the victim's clothing, and Defendant's clothing. The right cup of the victim's bra was saturated in blood, indicating that her head was forward.

A "look-out bulletin" was issued for Defendant, stating he was driving the victim's green Toyota Corolla. At 10:25 a.m., a Rutherford County Sheriff's deputy saw the vehicle parked at a gas station. The deputy attempted to conduct a traffic stop by activating his blue lights and siren, but Defendant fled. Officers pursued Defendant, and the pursuit ended after officers used spike strips to stop Defendant's vehicle. During the pursuit, officers saw Defendant put a gun to his head in an apparent gesture to commit suicide. Defendant's vehicle swerved and hit a guardrail and came to a stop. Defendant exited the car, and officers saw the gun lying on the ground beside him. There were no bullets in the chamber, or in the magazine for the weapon, recovered at the scene of the arrest. One .45 caliber bullet was found on the ground near the weapon. A beer bottle, marijuana, and a marijuana pipe

were found inside the vehicle. Defendant also had several pills in his possession, including nine Xanax, one Lortab, one Zanaflex, one Viagra, and one Ibuprofen.

Defendant was taken into custody and transported to Middle Tennessee Medical Center. Medical personnel reported that Defendant was awake, alert, and oriented as to time, person, and place. Defendant's affect and behavior were normal, and his speech was slightly slow and slurred. Defendant reported a history of gout, arthritis, and depression. Prior to arrival, paramedics had assessed a risk of overdose and had given Defendant Narcan, a medication designed to counter the potential effects of a narcotic opiate overdose. Defendant was observed at the hospital, and emergency room personnel determined that Defendant required no further medical intervention.

Sharon Jones was the property manager at the apartment complex where the victim was employed at the time of her death. Ms. Jones testified that the victim was a dependable employee and was never late for work. Ms. Jones was aware that the victim was going through a divorce and that she intended to move into the apartment complex with her children and that the victim had paid a year of rent in advance with the proceeds from the sale of a ring. The victim was expected to move on March 1, 2008. Ms. Jones was also aware of a romantic relationship between the victim and a coworker. On February 28, 2008, the victim was scheduled to be at work for a staff meeting at 9:00 a.m. Ms. Jones became concerned when the victim was late. Ms. Jones tried to reach the victim on her cell phone, and the victim did not answer. Ms. Jones then called the police to request a welfare check.

Sandy Bailey, another coworker, testified that she had lunch with the victim on February 24, 2008. During their lunch, the victim received a phone call, and she heard a man's voice yelling, "'I'm shutting the power off. You need to come home.'" Ms. Bailey testified that the vicitm appeared upset. On the morning of the incident, she was also concerned that the victim was late for work, and she called the victim shortly after 9:00 a.m. She testified that a man answered the victim's cell phone, and she thought that "was very odd." He told Ms. Bailey "in a very calm voice" that the victim would "be there shortly, she's running late."

Detective Jennifer West, of the Murfreesboro Police Department, was assigned to be the lead investigator in this case. She spoke to Defendant at the time of booking following Defendant's arrest. Detective West testified that she asked Defendant several statistical information questions, which Defendant correctly answered. Detective West also testified as to several documents relating to the parties' divorce proceeding, which were admitted into evidence. Detective West testified that prior to the shooting, Defendant had executed a durable power of attorney, appointing Defendant's father, James Vance, as his attorney-in-fact. Approximately one year after the shooting, on March 27, 2009, James Vance sold

Defendant's and the victim's vehicles to an individual in Manchester, Tennessee, for $2,500.00.

Jennifer Yarbrough, a Department of Children's Services caseworker, went with Defendant's parents to Defendant's and the victim's daughter's school following the shooting. They took the daughter to her brother's school, where they told both children about their mother's death. Ms. Yarbrough testified that the victim's daughter responded that "Daddy did it."

A forensic investigation of the crime scene revealed that the victim's DNA and blood was on the clothing and shoes Defendant was wearing at the time of the shooting. Defendant had gunshot residue on his hands and jacket, indicating that he had either fired a weapon or been in close proximity to a weapon being fired. There were also bullets missing from a box of ammunition recovered from Defendant's truck. A firearms analysis revealed that the weapon retrieved from Defendant upon his arrest was in normal operating condition. The bullet fragment and cartridge case recovered from the victim's residence had been fired from the weapon.

Attorney Daryl South was retained to represent the victim in early 2007. He filed a petition for divorce on her behalf on February 9, 2007. The victim had already obtained an *ex parte* order of protection against Defendant, and the victim told Mr. South about an incident when Defendant threw a cell phone at her chest. Mr. South observed a bruise on the victim's chest. The victim had attempted to call the police, but she hung up the phone when Defendant threatened her. Mr. South continued to represent the victim until her death. During that time, she told him of other incidents involving Defendant, including an incident in February, 2007, when Defendant attempted to run her off the road. Mr. South testified that the victim expressed fear for her safety "[e]very time [he] ever met with her." Mr. South testified that the victim "said very specifically that she was afraid [Defendant] would kill her."

Medical Examiner Bruce Levy performed an autopsy of the victim and determined that she died from a penetrating gunshot wound. The bullet entered the back, left side of the victim's head and exited on the left side of her face. The entrance wound showed no fouling or stippling, which would normally indicate that the weapon was at least two to three feet away when it fired. However, due to the victim's hair at the entrance wound, Dr. Levy could conclude only that the gun was not in contact with the victim's head when it was fired. Dr. Levy noted that the bullet hit the occipital bone of the skull, broke it, and passed through the side of victim's face, fracturing facial bones. The bullet did not pass through the victim's brain. Dr. Levy observed that the victim's eighth ribs were fractured, and there was bleeding around the fractures. Dr. Levy described it as "a compression type injury." He testified that

it was consistent with being "grabbed in kind of a bear hug maneuver and squeezed." The manner of the victim's death was homicide.

At trial, the defense asserted that Defendant lacked the mental capacity to premeditate the murder of his wife due to severe and ongoing depression. Defense expert Dr. Lynn Zager, a forensic psychologist, testified that she evaluated Defendant. Dr. Zager reviewed a 55-page document prepared by Defendant that contained his background information, and also the charging information and information obtained from law enforcement, jail records, records from Middle Tennessee Mental Health Institute and other medical records, reports of witness interviews generated by a private investigative firm, and a videotape of Defendant in an ambulance and the emergency room on the day of the shooting after Defendant's arrest. Dr. Zager administered the Minnesota Multiphasic Personality Inventory (MMPI) to identify any signs and symptoms of mental illness. She also conducted a clinical interview. She met with Defendant for a total of 11 hours between July, 2008, and April, 2009.

Dr. Zager found no indication that Defendant malingered in the MMPI test. She diagnosed Defendant with "major depression, recurrent severe with psychotic features," which is an Axis I disorder. Dr. Zager explained that major depression is a severe condition lasting at least two weeks which greatly interferes with a person's ability to function. She testified that psychotic features are "when a person has difficulty staying in contact with reality," and she testified that this finding was based on a report that Defendant had experienced auditory hallucinations. She also diagnosed Defendant with dysthymic disorder, which is "a very relatively mild depression" that lasts more than two years but does not interfere with a person's ability to function, and polysubstance dependence, based on Defendant's misuse of prescription medications to treat pain, anxiety, and depression. Dr. Zager found that at the time of the shooting, Defendant suffered from alcohol, opiate, sedative, hypnotic, or anxiolytic intoxication, and amnesic disorder. Dr. Zager testified that in her opinion, Defendant lacked the ability to form intent on the date of the shooting due to "major depression and the intoxication on the substances . . . and the amnesia."

Dr. Zager testified on cross-examination that in her review of Defendant's medical records, she did not find that Defendant had been prescribed antipsychotic medication. Defendant was prescribed the antidepressant Zoloft, and he reported that he had stopped taking it approximately one week before the shooting. Dr. Zager did not review the audio recording of Defendant's call to 911, and she was not aware of the substance of the call. Dr. Zager agreed that Defendant's call to 911 was a "purposeful act."

Detective Tommy Roberts, of the Murfreesboro police department, spoke to Defendant at the hospital following the shooting. Detective Roberts testified that

Defendant's demeanor was "anxious," but that he appeared "normal" and "seemed very coherent."

In rebuttal, the State called Dr. Sam Craddock, a forensic psychologist. Dr. Craddock evaluated Defendant between October 21, 2009, and November 19, 2009, while Defendant was a patient at Middle Tennessee Mental Health Institute (MTMHI). Dr. Craddock observed Defendant on six occasions, did psychological testing, reviewed police reports and Defendant's medical records, and also based his findings on staff observations. Dr. Craddock diagnosed Defendant with depressive disorder, not otherwise specified. Dr. Craddock testified that the treatment team's diagnosis "was based in part upon what he told us of him being depressed for a number of years and being on medication for depression." He testified,

> And considering his circumstances, that his family was now apart, he was incarcerated, he had medical problems. And it certainly made sense. I can't imagine somebody who wouldn't be depressed to some extent under these circumstances. So, that was the only diagnosis we gave him.

In Dr. Craddock's opinion, Defendant was "very likely mentally ill at the time [of the offense], [and Defendant was] very likely under the influence of drugs or alcohol." He testified, however, that Defendant was competent to stand trial and that he was able to appreciate the wrongfulness and the nature of his acts on the day of the offense. Dr. Craddock and another team member, Dr. Rokeya Farooque, concluded that Defendant had the ability to form intent to commit first degree murder. Dr. Craddock testified that Defendant suffered from "a mental disease or defect[,] [b]ut the mental disease or defect was not sufficient to deprive him of the ability [to form intent]." Dr. Craddock testified, "I find it, after thinking, hard to explain how [Defendant] could form intent to take his own life, but then would lack the intent to take somebody else's life."

On cross-examination, Dr. Craddock acknowledged that Defendant appeared to have been intoxicated following his arrest on the date of the incident. He testified that intoxication likely impaired Defendant's memory, judgment, and his ability to reflect. Dr. Craddock testified, however, that "to the extent that he couldn't form intent, no, I can't say that it was that severe an impairment." Dr. Craddock disagreed with Dr. Zager's assessment of amnesic disorder based on inconsistencies in the information Defendant provided, and he disagreed with her diagnosis of psychotic features, noting that Defendant was inconsistent in reporting that he had auditory hallucinations.

Dr. Rokeya Farooque, a forensic psychiatrist at MTMHI, testified that Defendant was admitted to MTMHI on October 21, 2009, for a court-ordered 30-day inpatient forensic

evaluation. Dr. Farooque found Defendant competent to stand trial, and she found no basis for an insanity defense. She found that Defendant was not committable for psychiatric treatment. Regarding diminished capacity, Dr. Farooque found that Defendant "was able to premeditate and with intention at the time of the crime of first degree murder."

**Analysis**

I.      *Motion for Judgment of Acquittal*

In his first issue, Defendant contends that the trial court erred in denying his "Motion for Judgment of Acquittal or a New Trial" because the evidence was insufficient to sustain his conviction for first degree premeditated murder. Defendant argues that the trial court's ruling regarding the motion was error because the trial court indicated an inability to recall the evidence at trial and Defendant's allegations of error at trial. The State responds that although the trial court candidly acknowledged a lack of memory at the post-trial hearing on Defendant's motion for new trial as to "some of the arguments raised" at trial, the trial court expressly approved the jury's verdict contemporaneously with the announcement of the jury's verdict.

A motion for judgment of acquittal raises a question of law for the trial court's determination. *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). When the trial court is presented with a motion for judgment of acquittal, the only concern is the legal sufficiency, as opposed to the weight, of the evidence. *State v. Blanton*, 926 S.W.2d 953, 957 (Tenn. Crim. App. 1996). Appellate courts are ill-suited to assess whether the verdict is supported by the weight and credibility of the evidence. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995). Thus, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure. *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993).

Accordingly, the standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction. *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013). That is, "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also* Tenn. R. App. P. 13(e). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999); *Burlison*, 868 S.W.2d at 719.

Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Rule 29 of the Tennessee Rules of Criminal Procedure provides as follows:

> Grounds for Judgment of Acquittal – On defendant's motion or its own initiative, the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Tenn. R. Crim. P. 29(b). "This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the [S]tate rests or at the conclusion of all the evidence." *State v. James*, 315 S.W.3d 440, 455 (Tenn. 2010) (citing *Overturf v. State*, 571 S.W.2d 837, 839 & n. 2 (Tenn. 1978)).

The trial court denied Defendant's motions for judgment of acquittal both at the close of the State's proof and following a hearing on his post-trial motion. Following the jury's verdict in this case, the trial court expressly approved the verdict as thirteenth juror, stating "Counsel, the Court agrees with the verdicts in this case and approves the jury's verdict as the 13th juror." In denying Defendant's motion for new trial, the trial court reaffirmed its earlier finding:

> The Court has previously approved the verdict as the thirteenth juror. The evidence in the case was overwhelming. Considering the weight of the evidence and the credibility of the witnesses the verdict was proper. The Court has weighed the evidence presented at trial and the credibility of the witnesses and affirms the verdict.

At the post-trial hearing, the trial court further stated:

> The Defendant argues there was insufficient proof to support the verdict. The evidence at trial was overwhelming that the Defendant shot the victim and then lied about the cause of death in a call to emergency responders. The Defendant then fled the scene. Defendant's argument's [sic] concerning the lack of sufficient proof is not supported by the proof.

Defendant argues that the evidence at trial was insufficient to support a jury finding of premeditation. First degree murder is defined as the intentional and premeditated killing of another. Tenn. Code Ann. § 39-13-202(a)(1) (2006). Defendant did not dispute at trial, nor does he dispute on appeal, that he was responsible for the victim's death. Rather, Defendant challenges the sufficiency of the evidence to establish premeditation.

Premeditation is defined as "an act done after the exercise of reflection and judgment" and committed after the accused "was sufficiently free from excitement and passion as to be capable of premeditation." Tenn. Code Ann. § 39-13-202(d) (2006). The presence of premeditation is a question of fact for the jury to determine based on a consideration of all of the evidence. *See State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. *See State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998); *State v. Addison*, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). Facts from which the jury may infer premeditation include the use of a deadly weapon on an unarmed victim; the lack of provocation on the part of the victim; the defendant's declarations of his intent to kill; the defendant's failure to render aid to the victim; the establishment of a motive for the killing; the particular cruelty of the killing; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing. *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citations omitted).

The evidence at trial shows that Defendant returned home from driving his children to school, took a .45 caliber pistol from his truck, and shot his wife in the back of the head in the foyer of their home. The evidence showed that the victim was unarmed when she was shot. Following the shooting, Defendant dragged his wife through the hallway, into their bedroom, and into the bathroom, and Defendant then left in the victim's car. Defendant called 911 and provided false information regarding the nature of the victim's injury and the severity of her injury. The proof showed that Defendant had previously threatened to kill his wife if she ever left him. Defendant had become aware, shortly before the shooting, that the victim had developed a romantic interest in a coworker and that she had sold a valuable ring. Defendant was also aware that a motion to set a final hearing had been filed in the pending divorce action. Defendant exhibited calmness after the shooting. After the victim had been shot, a coworker of the victim called the victim's cell phone when the victim was late for work, and Defendant told her that she was running late and would be there shortly.

From the evidence presented, the jury could reasonable have found that Defendant killed the victim intentionally and with premeditation. The evidence was sufficient to sustain

Defendant's conviction for first degree premeditated murder. The trial court did not err in denying Defendant's motion for judgment of acquittal.

II.     *Evidence of other crimes, wrongs, or acts*

Defendant contends that the trial court did not substantially comply with Tennessee Rule of Evidence 404(b) when it allowed testimony from several State's witnesses, including the victim's divorce attorney, Daryl South, 911 dispatcher Betsy Lee, Detective Jennifer West, and the victim's employer, Sharon Jones.

Tennessee Rule of Evidence 404(b) prohibits the introduction of evidence of other crimes or acts, except when the evidence of other acts is relevant to a litigated issue, such as identity, intent, or motive, and its probative value is not outweighed by the danger of unfair prejudice. The rule states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Assuming a trial court substantially complies with the requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). If, however, a trial court fails to substantially comply with the requirements of the rule, then the trial court's decision is not entitled to deference by the reviewing court. *Id*.

"Rule 404 was patterned in great measure on *State v. Parton*, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally

inadmissible." *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Rule 404 "establish[es] that character evidence cannot be used to prove that a person has a propensity to commit a crime." *Id.* (citing Tenn. R. Evid. 404(b); *State v. Adkisson*, 899 S.W.2d 626, 645 (Tenn. Crim. App. 1994)). Trial courts should take a "restrictive approach [to] 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). The more similar the conduct or act to the crime for which the defendant is on trial, the greater the potential for a prejudicial result. *McCary*, 119 S.W.3d at 243 (citing *State v. Bordis*, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995). Other crimes, wrongs or acts are admissible under Rule 404(b) when relevant to an issue other than the defendant's character, such as intent, motive, identity, common scheme or plan, or absence of mistake. *Id.*

### A.      Testimony of Daryl South

Defendant contends that the trial court erred in allowing the State to introduce the testimony of the victim's divorce attorney, Daryl South. Defendant argues that Mr. South's testimony contained both inadmissible hearsay and evidence of "other acts" that should have been excluded under Tenn. R. Evid. 404(b). The State responds that Defendant has waived the issue of whether any statements admitted were hearsay by failing to make contemporaneous objections at trial on that basis, and the State further asserts that evidence of Defendant's and the victim's "stormy marriage" was relevant to prove motive and intent and was therefore properly admitted.

Following a jury-out hearing, the trial court ruled that Mr. South could testify "for the purposes of going over the timeframe of the divorce. But that would be all." The trial court added that Mr. South could testify as to the victim's "state of mind when he discussed – when he represented her." Regarding prior bad acts of Defendant, the trial court limited Mr. South's testimony, stating as follows:

> Specifically, no acts that [Defendant] committed. Nothing about [selling] a boat. Nothing about the pendente lite hearing or what [the Special Master's] findings [regarding Defendant's credibility] were. Nothing about removing [marital assets] or what may or may not have been irrational. Those things are remote in time from the events that we are here on today. And at this time, [Defendant] has not testified.

Defendant argues that the trial court failed to substantially comply with Rule 404(b). Specifically, Defendant asserts that following the jury-out hearing, the trial court did not make a finding regarding what "other purpose" under which evidence of other bad acts was admissible, and that there was insufficient evidence that the other bad acts actually occurred.

-14-

It's not entirely clear from Defendant's brief on appeal what specific crimes, wrongs, or acts about which he is complaining. In fact, Defendant does not set forth in his argument any specific testimony of Mr. South. Rather, in his brief Defendant cites all of the pages of transcript that include Mr. South's testimony at trial. Based on Defendant's failure to cite to the record any specific testimony about which he now complains, we conclude that the issue is waived. *See* Tenn. Ct. Crim. App. R. 10(b); *see also* Tenn. R. App. P. 27(g) ("reference in the briefs to the record shall be to the pages of the record involved."). We deem it insufficient to cite to the entire testimony of a witness. Nevertheless, although the trial court failed to substantially comply with the procedural requirements of Rule 404(b), the record shows that testimony by Mr. South of the parties' "stormy relationship" was relevant to establish Defendant's intent and motive.

Under Tennessee Rule of Evidence 401, "relevant evidence" is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tenn. R. Evid. 401. Rule 403 prohibits, however, the introduction of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. In determining the admissibility of evidence, "the trial court must consider, among other things, the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial." *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).

In the case *sub judice*, Defendant was charged with the premeditated killing of his wife. The jury was required to find that Defendant acted intentionally. "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). Premeditation "means that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). Moreover, premeditation entails the exercise of reflection and judgment. *Id*.

The truly contested issue at trial in this case was not whether Defendant killed his wife, but rather it was whether Defendant possessed the requisite mental state for premeditated first degree murder. Culpable mental states "must [often] be inferentially made from the circumstances surrounding the killing." *State v. Hall*, 958 S.W.2d 679, 704 (Tenn. 1997). "Among the relevant circumstances are facts about the defendant's prior relationship and conduct with the victim from which the jury may infer a motive." *State v. Coulter*, 67 S.W.3d 3, 48 (Tenn. Crim. App. 2001) (citations omitted). In *Coulter*, this Court found that the notes and letters written by the defendant to his wife during the year prior to her murder

"uniquely imparted the [defendant's] perspective on his marriage and on his ongoing dispute with his wife, and thus were relevant to the issue of the defendant's motive and intent." *Id.* at 49; *see also State v. Elrod*, 721 S.W.2d 820, 823 (Tenn. Crim. App. 1986) (Statements made by the defendant's estranged wife during divorce proceedings concerning the defendant's sexual abuse and indicating the bitterness of the divorce were relevant to the issue of motive.).

It is well-established that a trial court may admit evidence of prior bad acts by a defendant against a victim to show intent and motive. In *State v. Glebock*, 616 S.W.2d 897, 905-06 (Tenn. Crim. App. 1981), this court held that prior bad acts between a victim of a violent crime and a defendant are admissible as relevant evidence to "indicate hostility toward the victim and a settled purpose to harm or injure [the victim]" where there was evidence of previous harassment and threats by the defendant against the victim. In *State v. Turnbill*, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982), we once again allowed evidence of the defendant's prior bad acts in the form of a guilty plea of criminal trespass to be admitted when the defendant had been originally charged with robbery of the same victim. In *Turnbill*, we held that the evidence of the prior bad act was relevant for purposes of the defendant's intent. In *State v. Smith*, 868 S.W.2d 561 (Tenn. 1993), our supreme court allowed similar evidence of prior bad acts by a defendant against the same victims. The court referenced the State's citation of *Glebock* and *Turnbill* supporting this position. The court also stated that the victims in that case had filed charges against the defendant based upon the prior assaults. In conclusion, the court held that prior bad acts could be used to prove motive in addition to proving intent. *Smith*, 868 S.W.2d at 574.

We conclude that evidence of Defendant's prior bad acts towards the victim were relevant to show Defendant's motive and intent. Defendant asserts, however, that the evidence of prior bad acts introduced through the testimony of Mr. South was not clear and convincing. Defendant further asserts that the statements made to Mr. South by the victim were inadmissible hearsay. We note that following the trial court's ruling regarding Mr. South's testimony, defense counsel made a general "hearsay objection to any statements that [the victim] made to Mr. South. . . ." The trial court noted that documents pertaining to the divorce action, which contained statements by the victim, had already been made exhibits without objection. Moreover, after Defendant's initial objection preceding a jury-out hearing, Defendant failed to specifically object to Mr. South's testimony at trial. Nevertheless, as the trial court noted and the State correctly asserts, the testimony by Mr. South as it related to the victim's statements that she feared Defendant and Defendant's threats against her was already admitted as evidence in documents pertaining to the divorce and the *ex parte* order of protection introduced as exhibits prior to Mr. South's testimony.

We therefore conclude that any error committed by the trial court was harmless. Although the trial court did not state its findings regarding the admissibility of the evidence on the record, we find that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Evidence that Defendant had previously threatened harm to the victim and that their marriage was in a state of turmoil was highly probative of Defendant's motive. Finally, we find that the testimony was proved by clear and convincing evidence. Furthermore, because the testimony offered by Mr. South regarding statements made by the victim about prior incidents between Defendant and the victim was already admitted into evidence in the form of the victim's affidavit in support of the order of protection, admission of the testimony, if error, was harmless. Defendant is not entitled to relief on this issue.

### B.     Betsy Lee

Defendant also contends that the trial court erred by allowing the State to introduce other evidence of prior bad acts under Tennessee Rule of Evidence 404(b).

Defendant asserts that the trial court should have excluded testimony of 911 dispatcher Betsy Lee that she observed in the 911 computer system a "flag" on the address of the residence of Defendant and victim, indicating that officer safety issues existed at the address. Defendant objected to Ms. Lee's testimony, and the court conducted a jury-out hearing to determine the admissibility of the evidence. Ms. Lee testified during the jury-out hearing that calls were received from the victim, Defendant, and their neighbors between February, 2007 and February, 2008. Because the calls were concerning domestic disputes and a weapon, the residence was given an "officer safety flag." The trial court found that "the prior specific reports or the information on those reports concerning what the nature of the call was or what the response to the call was" were not relevant and therefore excluded. However, the court allowed the State "to ask questions to ascertain why Ms. Lee sent out the police officer when she sent out a police officer." The trial court further clarified, "My ruling was that [Ms. Lee] could not go into the specifics or we could not enter the records that she referred to. However, she could testify as to what it is she did on that date that gave cause to why she did what she did on that day in fulfilling her job." Ms. Lee testified before the jury that upon receiving a call on the date of the shooting, she researched the call history to determine the reason for the officer safety flag and found "some weapon concerns[.]" She therefore alerted the police dispatcher to send officers to the scene. Defense counsel objected to the testimony about weapons as exceeding the scope of the court's ruling.

On appeal, the State argues that the evidence does not constitute bad act evidence under Rule 404(b) because Ms. Lee did not specifically implicate Defendant in any prior bad act, but rather stated that the address had been the subject of a 911 emergency call that had been "flagged" in the system because of a "weapons indication." The State further asserts

that the testimony was relevant to show why police were dispatched to the scene despite Defendant's misleading 911 call about the nature and extent of the victim's injuries. We agree with the State. Possession of a weapon is not necessarily a crime or wrongful act. *See State v. Reid*, 213 S.W.3d 792, 814 (Tenn. 2006) ("The testimony that Roberts saw the defendant in the possession of weapons similar to those used in the crimes did not necessarily constitute evidence of a bad act."). Moreover, because the trial court limited Ms. Lee's testimony and excluded introduction of any reports or testimony regarding specific prior 911 calls to the residence, there was no evidence presented that Defendant was the person in possession of a weapon at the residence.

We conclude that the evidence does not constitute evidence of a prior bad act. Therefore, the trial court's failure to substantially comply with the procedural requirements of Rule 404(b), by not stating on the record the purported bad act's relevance to a material issue or weighing the probative value of the evidence against the unfair prejudicial effect, is not error. Defendant is not entitled to relief on this issue.

## C.     *Detective West*

Next, Defendant asserts that the testimony of Detective Jennifer West was admitted in error. Specifically, Defendant complains about Detective West's testimony referencing an event that occurred during the parties' divorce in which Defendant was said to have "destroyed the house." Detective West was referencing a Special Master's report from the parties' divorce proceedings that had already been admitted into evidence without objection. Furthermore, Defendant did not object to the testimony at trial, and therefore this issue is waived for purposes of appeal. Tenn. R. Evid. 103; Tenn. R. App. P. 36(a).

## D.     *Sharon Jones*

Finally, Defendant complains that the trial court improperly permitted the State's witness Sharon Jones, the victim's supervisor, to testify about a welfare call she placed to 911 on the morning of the shooting. Specifically, Ms. Jones testified that she became concerned about the victim when the victim failed to arrive at work. Ms. Jones called 911 to request that someone check on the victim due to her concern about domestic violence. Prior to the State's calling Ms. Jones to testify, defense counsel objected to the testimony on the basis that it was not relevant to a material issue, that its probative value was outweighed by its prejudicial effect, and that the witness lacked personal knowledge. The court overruled the objection and noted that defense counsel would have the opportunity "to cross examine [Ms. Jones] if they believe she lacks sufficient knowledge." The trial court allowed Ms. Jones to testify. She testified that she called the Murfreesboro police department on the morning of the shooting "to do a welfare check." During that call, she stated that she "had

an employee that was supposed to be at work. And she hadn't showed [sic] up. And [she was] concerned about domestic violence."

Defendant asserts on appeal that the trial court erred by failing to conduct a jury-out hearing to determine the admissibility of Ms. Jones' testimony under Rule 404(b). However, Defendant failed to request a jury-out hearing or object on that basis in the trial court below. Tennessee Rule of Appellate Procedure 36(a) instructs this court that it is not required to grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Additionally, this court has held that a defendant cannot change theories from the trial court to the appellate court, and doing so generally waives appellate review of the issue. *See State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) (holding that "[i]t is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal"). These procedural rules support our long-standing policy of refraining from finding a trial court to have erred in matters not brought to its attention through proper objections at trial. Because the Defendant failed to properly present the issue at trial and now wishes to change his evidentiary theory on appeal, we find the issue has been waived.

III.   *Expert testimony regarding Defendant's mental state*

Defendant contends that the trial court abused its discretion by limiting the testimony of defense expert, Dr. Lynn Zager, regarding her opinion that Defendant lacked the requisite mental capacity at the time of the offense and by excluding the testimony of defense expert, Dr. Murray Smith, finding that Dr. Smith's testimony was cumulative of Dr. Zager's. Defendant further asserts that the trial court erred by allowing the State's expert, Dr. Rokeya Farooque, to testify, arguing that Dr. Farooque's testimony was cumulative of another State's expert witness, Dr. Samuel Craddock.

Ordinarily, expert testimony regarding a defendant's capacity or lack of capacity to form the mental state required for the commission of an offense is admissible if it satisfies "general relevancy standards as well as the evidentiary rules which specifically govern expert testimony." *State v. Hall*, 958 S.W.2d 679, 689 (Tenn. 1997). In this regard, Tennessee Rule of Evidence 401 provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, even relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Further, Tennessee Rule of Evidence 702 requires that expert testimony "substantially assist the trier of fact to understand the evidence or to determine a fact in issue," and Rule 703 requires that the facts or data underlying the expert's opinion be trustworthy. A trial

court's application of these rules to exclude expert testimony will not be reversed on appeal absent an abuse of discretion. *State v. Edison*, 9 S.W.3d 75, 77 (Tenn. 1999).

Under Tennessee law, evidence of a mental disease or defect that does not rise to the level of an insanity defense is nevertheless admissible to negate elements of specific intent. *State v. Phipps*, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). In *Hall*, our supreme court explained:

> [D]iminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed. In other words, "diminished capacity" is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state.

958 S.W.2d at 688 (citations omitted). However, "such evidence should not be proffered as proof of 'diminished capacity.' Instead, such evidence should be presented to the trial court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried." *Id*. at 690. Put another way, for expert testimony regarding a defendant's mental state to be admissible, the expert must testify that (1) the defendant has a mental disease or defect and that (2) because of the mental disease or defect, the defendant lacks the capacity to form the requisite mens rea. *See Hall*, 958 S.W.2d at 689-91.

In *State v. Ferrell*, 277 S.W.3d 372 (Tenn., 2009), our supreme court discussed the ruling in *Hall*. The *Ferrell* court clarified that the "decision in *Hall* established that the [mental health] testimony is properly admissible if it satisfies the relevancy and expert testimony provisions in the Tennessee Rules of Evidence and its content indicates that a defendant lacked the capacity to form the required mental state for an offense . . . ." *Id*. at 379. Our supreme court explained that the *Hall* holding "was based upon the broader legal principle that 'expert testimony relevant to negating intent is admissible in Tennessee even though diminished capacity is not a defense.'" *Id*. (quoting *Hall*, 958 S.W.2d at 691). The court further explained that "*Hall* recognized that a defendant may negate an element of the offense as a defense to the prosecution." *Id*. at 380.

A. *Dr. Lynn Zager*

In a jury-out hearing, Dr. Zager testified that at the time of the offense, Defendant suffered from major depressive disorder, as evident by Defendant's prior suicide attempts, and that Defendant was unable to appreciate the wrongful nature of his behavior as a result of voluntary substance abuse, intoxication, severe depression, and suicidal ideations. Dr. Zager testified that it was her opinion that Defendant could not have acted intentionally on the date he shot and killed his wife. She testified that for approximately one week preceding the shooting, Defendant did not have the capacity to form intent due to "the major mental illness, which is the major depressive disorder." Dr. Zager testified that Defendant's depression had become "so severe" that Defendant's "ability to cope, his ability to think, his ability to deal with issues was severely, severely impaired."

At the conclusion of the jury-out hearing, the trial court ruled that Dr. Zager's testimony was admissible:

> [T]he Court finds that Dr. Zager's testimony during the hearing outside the presence of the jury reflected her belief that because of a mental defect or disease, to wit, depression, [Defendant] was incapable of forming the requisite state of mind.
>
> I'm going to allow Dr. Zager to testify if the Defense wants to put her on. If the Defense does decide to put her on, then I think the State has accurately pointed out that her testimony should be constrained to that opinion concerning state of mind and efforts to negate the required state of mind for this crime or these crimes.

At trial, Dr. Zager, a clinical psychologist, testified that based on her evaluation of Defendant, she diagnosed Defendant with "major depression, recurrent severe, with psychotic features." She testified that Defendant had auditory hallucinations. She also diagnosed Defendant as having dysthymic disorder, "a very relatively mild depression," polysubstance dependence on prescription medications for depression, "[a]lcohol, opiate, sedative, hypnotic, or anxiolytic intoxication," and "amnesic disorder not otherwise specified." Dr. Zager testified that Defendant "lacked the ability to form the intent for what he is accused of." Dr. Zager testified that Defendant was unable to form intent because of "[h]is major depression and the intoxication on the substances." Dr. Zager testified that in her opinion, Defendant's "thinking, his judgment, and his ability to carry out purposeful behavior was impaired as a result of the depression, the intoxication, and the amnesia."

Defendant contends that the trial court erred by limiting Dr. Zager's testimony to Axis I mental defects and diseases, "thus depriving the Defendant of due process of law." Defendant asserts that Dr. Zager was not able to fully describe her report or answer questions

regarding Defendant's mental condition.  Defendant offers as an example that Dr. Zager "was unable to testify as to several tests that she administered to evaluate [Defendant], which would have helped to explain her diagnosis."  However, as the State points out, Defendant does not identify what specific tests, opinion, or information was improperly excluded, nor does Defendant state how he was prejudiced by the trial court's limitation on Dr. Zager's testimony.  Therefore, we are unable to conclude as much.  Our review of Dr. Zager's testimony both in the jury-out hearing as well as at trial shows that Dr. Zager's testimony falls within the parameters set forth in *Hall*, and the trial court did not abuse its discretion by limiting the testimony to her opinion as to Defendant's lack of capacity "due to a mental disease or defect," in accordance with *State v. Hall*.

### B.    Dr. Murray Smith

Defendant also contends that the trial court erred by excluding the testimony of defense medical expert Dr. Murray Smith as cumulative of the testimony of Dr. Zager.  In a jury-out hearing, Dr. Smith agreed with Dr. Zager's findings and testified that, at the time of the murder, Defendant was in a state of major depression manifested by multiple suicide attempts and was psychotic in terms of auditory hallucinations commanding him to kill himself.  He further testified that on the date of the shooting, Defendant was intoxicated with alcohol, Xanax, and opiates, and suffered from drug-induced amnesia.  Dr. Smith testified that "the nature of the depression was psychosis combined with his severely intoxicated state," and that at the time of the offense, Defendant's mental status "was one of severely impaired perception and severely impaired judgment."  Dr. Smith testified that on February 23, 2008, Defendant intended to kill himself, but "he was unable to do that physically because he was so impaired."  Dr. Smith also testified that on February 28, 2008, Defendant "could not intentionally act because he was unable to really appreciate, to reflect on what was happening, to exercise judgment."  Dr. Smith testified that Defendant lacked the capacity to form intent at the time of the shooting as "a direct result of that mental defect of major depression."  Dr. Smith testified,

> [Defendant's] decision to discontinue his antidepressant medication, Zoloft, about one week prior to his decision to end his life by suicide was the trigger that began a cascade of events that resulted in the shooting death of Suzanne Vance, and [Defendant] was not mentally capable of understanding the circumstances occurring about him and was not capable of directing his behavior in a rational manner.

The trial court noted that in Dr. Smith's report, he stated "in several places" that he agreed with Dr. Zager's findings.  The trial court excluded Dr. Smith's testimony, finding as follows:

[T]he reason I'm excluding Dr. Smith is because it's my opinion that his testimony would be cumulative to Dr. Zager based on a large portion of his findings being based on Dr. Zager's report. And, further, that his testimony is, is that there was a combination of factors that included alcohol and drug abuse, in addition to the depression, which led to his inability on that day to act intentionally. And, so, for that reason, I'm excluding Dr. Smith.

Defendant asserts that Dr. Smith's findings were distinct from those of Dr. Zager but does not state what those distinctions are other than their professions, Dr. Zager being a psychologist, and Dr. Smith being a medical doctor. Relying upon *State v. Ferrell*, 277 S.W.3d 372 (Tenn. 2009), Defendant points out that Dr. Smith testified that he was not a psychiatrist, but a medical doctor trained in internal medicine and addiction medicine. While *Ferrell* does state that expert testimony regarding a defendant's capacity to form a requisite mental state is not limited to psychiatric testimony and that other forms of expert testimony are permissible, the trial court's ruling in this case does not state that the reason for excluding Dr. Smith's testimony was because of his credentials. Defendant states in his brief that Dr. Zager "made findings that were distinct from those of Dr. Zager and his expertise touched in other areas that were vital to the defense and proper to be put before the jury for its consideration[,]"; however, Defendant does not state how Dr. Smith's findings were distinct from Dr. Zager's findings, and significantly, how the exclusion of his testimony prejudiced his defense.

We note that there is little practical difference between the testimony of Dr. Zager and Dr. Smith in this case. Both experts based their findings on the same information, including Defendant's medical records from Middle Tennessee Mental Health Institute, in person meetings with Defendant, and background information provided by Defendant. Both experts found that Defendant suffered from severe depression, suicidal thoughts, psychosis, intoxication, and amnesia. Both experts reached the same or substantially similar conclusions, that Defendant lacked the mental capacity to form intent at the time of the crime because of major depression.

The State asserts that Dr. Smith's testimony makes clear that his opinion reflects Defendant's diminished capacity as a result of intoxication, among other factors, rather than a lack of capacity to form intent as a result of a mental disease or defect. The State asserts that Dr. Smith's proposed testimony did not meet the prerequisites of *Hall* because of Dr. Smith's "concessions in the jury-out hearing that the defendant had the capacity to act with intent and premeditation at the time of the offense" because Dr. Smith testified that Defendant had formed the intent to kill himself. Having carefully reviewed Dr. Smith's testimony, we find that he did, in fact, state in one instance that he concluded that Defendant lacked the capacity to form intent at the time of the shooting and that it was "a direct result

of that mental defect of major depression." However, we agree with the State that the thrust of Dr. Smith's opinion went not to Defendant's lack of capacity to form intent as a result of a mental disease or defect, but rather to Defendant's diminished capacity as a result of intoxication. Therefore, we conclude that it was not error to exclude Dr. Smith's testimony on the grounds that it fell outside the bounds of *Hall* and its progeny. The trial court did not abuse its discretion by excluding Dr. Smith's testimony. Defendant is not entitled to relief on this issue.

### C.     Dr. Rokeya Farooque

Defendant also contends that the trial court abused its discretion by allowing the State to present the expert testimony of Dr. Rokeya Farooque. He argues that Dr. Farooque's testimony should have been excluded under Tennessee Rule of Evidence 403 as cumulative of the State's other mental health expert, Dr. Samuel Craddock. Defendant asserts that Dr. Farooque's testimony "unjustly bolster[ed] the State's case against the defendant." The State attempts to distinguish the two experts on the basis that Dr. Farooque was allowed by the trial court "to explore her *medical* findings." However, having reviewed both doctors' trial testimony, we are unpersuaded that Dr. Farooque's testimony differed from Dr. Craddock's in any significant respect. The State correctly points out in its brief that Dr. Farooque's testimony at trial was "consistent with Dr. Craddock's with respect to the defendant's mental condition on the day of the crime." Drs. Craddock and Farooque were on the same forensic evaluation team, and the State asserts that Dr. Farooque's testimony was therefore relevant.

Relevant evidence, however, may be excluded "if its probative value is substantially outweighed by . . . considerations of . . . needless presentation of cumulative evidence." Tenn. R. Evid. 403. In the case *sub judice*, the trial court overruled Defendant's objection and allowed Dr. Farooque to testify "for the limited and restricted purposes that [the State has indicated]. . . . If you ask her anything about the report that Dr. Craddock has testified to, I would ask that [defense counsel] renew his objection as being cumulative. And I plan to sustain that objection."

We note that Dr. Farooque's testimony was very brief and addressed only her conclusions regarding Defendant's ability to form intent. In fact, the substance of Dr. Farooque's testimony is contained in only three pages of transcript. We also note that during Dr. Farooque's brief testimony, defense counsel did not renew his objection. While Dr. Farooque's testimony may have been cumulative of Dr. Craddock's testimony, we do not believe that the trial court's admission of the testimony unfairly prejudiced Defendant. Accordingly, the trial court did not abuse its discretion in allowing Dr. Farooque to testify. Defendant is not entitled to relief on this issue.

IV. *Admissibility of photographs of the victim*

Defendant contends that the trial court erred by allowing the State to introduce into evidence a photograph of the victim taken when she was alive. The victim's mother, Cindy Jarvis, identified the victim in the photograph, which was taken approximately one year prior to the victim's death. The State introduced and the trial court admitted the photo into evidence without objection by defense counsel. Defendant now challenges the admissibility of the photograph, arguing that the victim's appearance before her murder is "absolutely not relevant to proving the charges against the Defendant" and that the photograph inflamed the jury. The State responds that by failing to object at trial, Defendant has waived the issue.

In order to be admitted as evidence, a photograph must be relevant to an issue decided by the trier of fact and its probative value must not be outweighed by any unfair prejudicial effect that it may have upon the trier of fact. *State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998); *see* Tenn. R. Evid. 401-403. In making this assessment, trial courts should consider the questions of fact to be presented to the jury and any evidence presented during the course of the trial. *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). The admission of photographs is generally within the discretion of the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. *State v. Young*, 196 S.W.3d 85, 105 (Tenn. 2006) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)).

By failing to make a contemporaneous objection to the introduction of the photograph at trial, Defendant has waived the issue. See Tenn. R. Evid. 36(a). Nevertheless, this court has consistently cautioned the State against the introduction of such photographs as evidence because they typically lack relevance to the issues on trial and because of their potential to unnecessarily arouse the sympathy of the jury. *See, e.g., Young*, 196 S.W.3d at 106 (finding error in the trial court's admission of childhood photographs of the victim and calling for trial courts to "understand the proof and theory of the case, and whether there is a real dispute about the issue the evidence is to prove" (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 403. [5] (5th ed. 2005)); *State v. Cole*, 155 S.W.3d 885, 911-12 (Tenn. 2005) (recognizing that although "[a] family photograph may be relevant to establish the victim's identity as the person killed," "a photograph must be found relevant to an issue that the jury must decide before it may be admitted into evidence"); *State v. Nesbit*, 978 S.W.2d 872, 902 & n. 3 (Tenn. 1998) (finding no error in admission of photograph taken while victim was alive but recognizing that "where the victim's identity has already been proven, further proof may be cumulative and, therefore, inadmissible"); *State v. Dicks*, 615 S.W.2d 126, 128 (Tenn. 1981) ("[I]t would have been better had the 'before' picture of [the victim] been excluded since it added little or nothing to the sum total of knowledge of the jury.").

While we conclude that it was error for the trial court to admit the photograph into evidence, Defendant is not entitled to relief on appeal if the error had no effect on the results of the trial. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Generally, photographs taken during the life of a victim are not so prejudicial as to warrant a new trial. *See Cole*, 155 S.W.3d at 912 (finding a portrait-style picture of the victim taken prior to his murder to have no prejudicial effect on the defendant's trial). If a photograph should have been excluded because it adds "little or nothing to the sum total of knowledge of the jury," the admission of the photograph, unless somehow prejudicial because of its content, typically qualifies as harmless. *See Dicks*, 615 S.W.2d at 128 (finding harmless error in admission of victim's "before" photograph); *see also Young*, 196 S.W.3d at 106 (finding harmless error in admission of victim's childhood photograph despite its potential to stir the jury's sympathy); *State v. Richardson*, 697 S.W.2d 594, 597 (Tenn. Crim. App. 1985) ( "As to the photographs of [the victim taken before and after her murder], we find no prejudicial error in their admission."). In this instance, any error was clearly harmless. Defendant is not entitled to relief on this issue.

Defendant also challenged the admission of photographs, taken during an autopsy of the victim, of the gunshot wound to the victim's head. Defendant argues that the photographs were unnecessary because Defendant did not challenge that the victim was shot, and there was extensive testimony about the entrance and exit wounds, the distance of the victim from shooter, and the trajectory of the bullet. Again, the State responds that Defendant has waived this issue by failing to object to the admission of the photographs at trial.

The record shows that Defendant failed to make a contemporaneous objection at trial to the admission of the photographs into evidence. Defendant states in his brief that he objected to the photographs in a pretrial motion *in limine* filed on April 9, 2010. However, Defendant fails to cite in his brief where in the record a determination was made regarding the motion to exclude photographs of the victim's body. Nevertheless, a thorough search of the record reveals that the motion was first addressed at a pretrial hearing on May 21, 2010. At that hearing, defense counsel and the State agreed to review photographs that the State proposed to introduce prior to trial in order for the trial court to review them and make rulings on each photograph at a later date. At another pretrial hearing on February 4, 2011, the State submitted several "disputed" photographs of the victim's body, taken both at the crime scene and during the autopsy, for the trial court's review. The photographs were not made exhibits to the hearing, and therefore, we are unable to discern from the record the content of the photos, other than by some brief descriptions of the photos from the transcript of the hearing. The trial court took the matter under advisement, stating that it would make

a ruling on the admissibility of the photographs prior to the start of trial. In a subsequent written order, the trial court excluded seven photographs, referenced in the order only by number (photographs 19, 20, 21, 25, 34, 38, and 41), finding as follows:

> The State argues the photographs identified as [photographs 19, 20, 21, 25, and 34] are necessary for the jury to see the relative location of the wound and be able to show the angle the bullet traveled through the head of the victim. The Court finds the photographs are no more beneficial to such a determination as an anatomical diagram or the testimony of an expert. However, if the defense disputes the cause of death or the nature and extent of the wounds inflicted on the victim the Court upon proper motion and after a jury out hearing reserves the right to allow their introduction.

Although the State correctly observes that Defendant failed to make a contemporaneous objection to the autopsy photographs during Dr. Levy's testimony at trial, presumably, Defendant objected to the photographs prior to trial. Based on the record before us, it is unclear why the trial court allowed certain autopsy photographs depicting the victim's wounds while excluding others on the basis that such photographs were not relevant, as the matters mentioned in the court's ruling above were undisputed.

Nevertheless, at trial defense counsel specifically stated, "No objection" to the introduction of the eight photographs introduced as an exhibit to Dr. Levy's testimony, four of which depict the victim's wound. Therefore, we conclude that Defendant has waived the issue by failing to renew his objection at trial. See Tenn. R. App. P. 36(a). Furthermore, absent waiver, we conclude that the photographs are not overly gruesome as Defendant claims in his brief. The photos were admitted as exhibits to Dr. Levy's testimony, and there are two photographs each of the entrance wound and exit wound. The photographs were taken after the wound was cleaned, there is very little blood, and they show only the wound itself and not the victim's face or body. We conclude that the probative value of the photographs is not outweighed by their prejudicial effect in this case, and the trial court did not abuse its discretion in allowing them into evidence. Further, it does not affirmatively appear that the "admission of the photograph [ ] has affected the results of the trial." *See Banks*, 564 S.W.2d at 953. Defendant is not entitled to relief on this issue.

## V.     *Admissibility of a durable power of attorney*

Defendant contends that the trial court abused its discretion by allowing the State to introduce into evidence a durable power of attorney executed by Defendant approximately one week after the victim's death. Defendant asserts that the State sought to introduce the document to show that Defendant possessed the requisite mental state to commit the crime

charged. Specifically, Defendant argues that the attestation clause in the document was intended by the State to show Defendant's competency; however, Defendant asserts, his competency was never an issue at trial, and therefore, the document had no relevance and served only to "confus[e] the jurors with improper information regarding [Defendant's] mental state at a time not relevant to their determination of the issues at hand."

The State responds that the record fails to show that the document was ever admitted into evidence. In his brief, Defendant cites the testimony of Detective Jennifer West, who testified that in March, 2009, Defendant's father sold two vehicles owned by Defendant under "a power of attorney that was brought forth at some point after the investigation started." The titles of both vehicles were admitted into evidence; however, the record does not indicate that the durable power of attorney was offered or admitted into evidence.

In a jury-out hearing before Detective West's testimony about the admissibility of evidence of the property transfer, the State argued that proof of the transfer was relevant to Defendant's state of mind, particularly in view of Defendant's contention that he had long suffered from a mental disease or defect. The State asserted, "There is a history of hostility that we are showing in this relationship . . . . That hostility existed in terms of no remorse . . . . [I]f it's an accident, why would he dispose of everything that this woman and children had some proper right to if it's an accident[?]" The trial court limited testimony concerning the property transfer to "who transferred this vehicle. . . . [a]nd that's all. And then if there is some other reason it becomes relevant, I will allow you to bring it up on rebuttal."

The durable power of attorney executed by Defendant was not admitted into evidence, nor were its contents disclosed to the jury. In fact, in the trial court's order denying Defendant's motion for new trial, the trial court observed that "[t]he document referred to in the motion is not listed among the exhibits admitted at trial[, and] Defendant was unable to demonstrate to the court the power of attorney referenced in his motion was ever admitted into evidence." Therefore, we conclude that the issue is without merit.

## VI.    *Severance of the offenses*

Defendant contends that the trial court abused its discretion in denying his request to sever count 1 of the indictment, charging him with first degree premeditated murder, from the remaining counts in the indictment. Defendant argues that Tennessee Rule of Criminal Procedure 14 required severance of the offenses because the offenses were not part of a common scheme or plan. Specifically, Defendant asserts that when he left his home after shooting the victim, his intent was to commit suicide, not to evade arrest. The State contends that Tennessee Rule of Criminal Procedure 8 required joinder of the offenses because they were part of a single criminal episode.

Defendant was originally charged in an eight-count indictment with premeditated first degree murder, count 1; making a false report to a law enforcement officer, count 2; evading arrest, count 3; aggravated assault, count 4; unlawful possession of a deadly weapon, count 5; unlawful possession of a Schedule IV controlled substance, count 6; simple possession of marijuana, count 7; and unlawful possession of drug paraphernalia, count 8.

Defendant requested severance of the offenses in a motion *in limine*. In a written order entered following a hearing on the motion, the trial court severed counts 1, 2, 3, and 5 from counts 4, 6, 7, and 8. The State subsequently dismissed with prejudice counts 6, 7, and 8 of the indictment. The trial court found that the offenses arose from the same criminal episode and were thus subject to mandatory joinder under Rule 8 of the Tennessee Rules of Criminal Procedure. The court further found that severance of the offenses of aggravated assault, possession of a Schedule IV drug, possession of marijuana, and possession of drug paraphernalia was necessary to promote a fair determination of Defendant's guilt or innocence pursuant to Tennessee Rule of Criminal Procedure 14(b)(2)(A) because evidence of those charges, although admissible in a trial of the "charges directly related to the alleged murder of the victim," would be more prejudicial than probative.

We review a trial court's denial of a motion for severance for an abuse of discretion. *See State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). As such, a trial court's refusal to sever offenses will not be reversed unless the court applied an incorrect legal standard, reached an illogical conclusion, based its ruling on a clearly erroneous standard assessment of the evidence, or applied reasoning that caused injustice to a complaining party. *State v. Jordan*, 325 S.W.3d 1, 39 (Tenn. 2010). Also, a trial court abuses its discretion when it fails to consider the factors provided by a higher court as guidance for determining a particular issue. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007).

Here, all the offenses were charged in a single indictment. Tennessee Rule of Criminal Procedure 8 provides for both mandatory and permissive joinder of offenses. Two or more offenses shall be mandatorily joined in the same indictment if the offenses are: "(A) based on the same conduct or arise from the same criminal episode; (B) within the jurisdiction of a single court; and (C) known to the appropriate prosecuting official at the time of the return of the indictment(s). . . ." Tenn. R. Crim. P. 8(a)(1). The State's failure to mandatorily join offenses will bar it from later prosecuting the uncharged offenses, unless the offenses are severed pursuant to Tennessee Rule of Criminal Procedure 14. Tenn. R. Crim. P. 8(a)(2); Tenn. R. Crim. P. 8, Advisory Comm'n Comment; *State v. Johnson*, 342 S.W.3d 468, 473 (Tenn. 2011). Offenses may be joined for trial if "(1) the offenses constitute parts of a common scheme or plan; or (2) they are of the same or similar character." Tenn. R. Crim. P. 8(b).

Regardless whether the joinder of offenses was mandatory or permissive, the defendant may file for a severance of offenses pursuant to Tennessee Rule of Criminal Procedure 14. In cases of mandatory joinder, when the defendant asks for a severance prior to trial, "the court shall grant a severance of offenses . . . when the court finds a severance appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." Tenn. R. Crim. P. 14(b)(2). In cases of permissive joinder, "the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1).

Thus, the first question we must answer is whether the joinder of offenses in a single indictment in this case was mandatory or permissive. On appeal, the State cites *State v. Johnson*, 342 S.W.3d 468 (Tenn. 2011), in support of its argument that joinder was mandatory because "the charges against the defendant . . . arose from a succession of acts" and are therefore part of the "'same criminal episode.'" The trial court agreed with the State that joinder of the offenses was mandatory.

In *Johnson*, our supreme court adopted "the criteria for a 'single criminal episode' found in the ABA Standards for Criminal Justice." 342 S.W.3d at 475. Under those standards, for principles of mandatory joinder to apply, "the acts to be included in the same criminal episode must occur simultaneously or in close sequence and must occur in the same place or in closely situated places." *Id*. The court observed that

> in order for a single criminal episode to exist, the "proof of one offense necessarily involves proof of the others." 2 ABA Standards for Criminal Justice § 13-1.3 cmt., at 13.10. This means that the proof of one offense must be 'inextricably connected' with the proof of the other, *see State v. Shepherd*, 902 S.W.2d 895, 904 (Tenn. 1995), or that the proof of one offense forms a "substantial portion of the proof" of the other offense. *See United States v. Montes-Cardenas*, 746 F.2d 771, 776 (11th Cir. 1984).

*Id*.

In this case, because the charges against Defendant arose from different acts, the offenses must be part of the "same criminal episode" in order for the offenses to be mandatorily joined. The evading arrest, reporting false information, and unlawful possession of a deadly weapon offenses occurred as a separate physical action from the first degree murder. Although those offenses did not occur simultaneously with the first degree murder offense, the offenses occurred in close sequence. The evidence reflects that the offenses constituted a series of interrelated events, beginning with the murder of Defendant's wife.

Shortly after the shooting, Defendant left the home in possession of the murder weapon, called 911 and reported false information about his wife's injury, and shortly thereafter, led police on a chase. The evading arrest offense was committed during the investigation of the first degree murder offense, and evidence pertaining to the first degree murder "would necessarily require proof pertaining" to the other offenses. *See Shepherd*, 902 S.W.2d at 903. Moreover, proof of the first degree premeditated murder "necessarily involve[d] proof of the other[s]" offenses, that Defendant gave false information to authorities, was in possession of the murder weapon, and fled from police. *See Johnson*, 342 S.W.3d at 475. As we have already stated, proof that Defendant evaded arrest and reported false information were admissible and relevant to prove premeditation. We therefore conclude that joinder of the offenses in this case was mandatory.

Pursuant to Rule 14(b)(2)(A), mandatorily joined offenses may be severed if "it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." A trial court's denial of a motion to sever pursuant to Rule 14(b)(2)(A) "will not be reversed unless the [defendant] was prejudiced by the decision to try the charges together." *State v.. Thompson*, 88 S.W.3d 611, 614 (Tenn. Crim. App. 2000) (citing *State v. Wiseman*, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982)). In this case, the trial court granted in part and denied in part Defendant's motion for severance, finding that Defendant would be unfairly prejudiced by introducing evidence pertaining to the drug possession and aggravated assault charges. However, the trial court declined to sever Defendant's first degree murder charge from the offenses of evading arrest, making a false report, and unlawful possession of a deadly weapon. As we stated, evidence of evading arrest, making a false report to a law enforcement officer, and unlawful possession of a deadly weapon, was admissible and relevant to establishing proof of the first degree premeditated murder. Furthermore, Defendant has not presented evidence that he was prejudiced by the mandatory joinder of the offenses related to the death of the victim. We find no abuse of discretion in the trial court's ruling. Defendant is not entitled to relief on this issue.

## VII.    *Consecutive sentencing*

Defendant asserts that the trial court erred in ordering his sentences in counts 2, 3, and 5 to run consecutively to his life sentence in count 1 for first degree murder. Defendant argues that the trial court's reliance on the "dangerous offender" factor under Tennessee Code Annotated section 40-35-115(b) was erroneous because "the severity of the offense has already been taken into account in the sentencing scheme for first degree murder." Defendant further asserts that, because he had already received a life sentence in count 1, consecutive sentencing was unnecessary to protect the public. The State contends that the trial court did not abuse its discretion in ordering consecutive sentences and that the trial

court's reasoning in imposing consecutive sentences was consistent with the purposes and principles of the Sentencing Act.

The decision to impose consecutive sentences rests within the sound discretion of the trial court. *State v. Hayes*, 337 S.W.3d 235, 266 (Tenn. Crim. App. 2010); *State v. Hastings*, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999); *see also State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012) (adopting an abuse of discretion standard of review for sentence length and giving a presumption of reasonableness to within-range sentences that reflect a proper application of the purposes and principles of the Sentencing Act).

A court may order consecutive sentences in cases where it finds any of seven statutorily enumerated criteria to be applicable "by a preponderance of the evidence." Tenn. Code Ann. § 40-35-115(b). Those criteria include a finding that the defendant is a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. §40-35-115(b)(4). Consecutive sentencing is also "guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002) (citing Tenn. Code Ann. §§ 40-35-102(1), -103(2)).

Because the criterion that the defendant is a dangerous offender is "the most subjective and hardest to apply," this category requires additional findings in order to support consecutive sentencing. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). "Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995). Evidence must also show that the sentence is reasonably related to the severity of the offense and necessary to protect the public from the defendant's further criminal activity. *Id*.; *but see State v. Clifton*, No. W2012-01651-CCA-R3-CD, 2013 WL 2297130, at *10 n. 8 (Tenn. Crim. App. May 21, 2013) (questioning the "continuing vitality" of *Wilkerson*'s requirements for additional findings for the dangerous offender category in light of *Bise*).

In ordering consecutive sentences, the trial court found that Defendant "is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." The court further found that an extended sentence was "necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentence reasonably relates to the severity of the offenses committed." Considering the seriousness of the offense, the court noted that

Defendant allowed the victim to lie in the floor bleeding "for some considerable period of time . . . without receiving any assistance or aid[,]" and that Defendant further prevented the victim from receiving medical aid by providing false information to emergency services. The trial court stated,

> [T]he Court believes that the life sentence is appropriate for the murder, however it feels that based on filing a false report with 911, hesitating between the time to allow the significant amount of blood that left Mrs. Vance's body while she was laying in that hallway, and then moving her to another room and then going outside of the house and calling and making a false report certainly is a serious offense and should be treated as such.
>
> . . . .
>
> There is no more serious offense than taking the life of another human being. And further, then to have the opportunity to provide some assistance and rather than providing assistance to attempt to confuse or obfuscate those would could reply and give response by giving false information, moving the body, the Court finds [sic] requires this Court to make those sentences consecutive to the life sentence.

We conclude that the facts in this case support the trial court's conclusion. The trial court articulated its findings based on *State v. Wilkerson*, and despite Defendant's suggestion otherwise, nothing prevents a court from ordering sentences to run consecutively to a life sentence for a first degree murder conviction. The trial court did not abuse its discretion in imposing consecutive sentences. Defendant is not entitled to relief on this issue.

*VIII. Sufficiency of the evidence*

As his final issue, Defendant contends that the evidence at trial was insufficient to sustain his conviction for first degree murder. Specifically, Defendant contends that the proof fails to support a finding of premeditation.

In addressing Defendant's first issue regarding the propriety of the trial court's denial of his motion for acquittal, we addressed the issue of whether the evidence at trial was sufficient to prove premeditation. In addressing that issue, we stated the relevant standard of review, the elements of first degree premeditated murder, and we reviewed the evidence and concluded that it was sufficient to affirm the trial court's denial of Defendant's motion for judgment of acquittal. Nevertheless, we will briefly summarize the evidence showing that premeditation was proven beyond a reasonable doubt.

Viewed in the light most favorable to the State, the evidence established that on the morning of February 28, 2008, Defendant drove his children to school and returned to his residence, where the victim was preparing to go to work. Defendant took a .45 caliber pistol from his truck and loaded the weapon with ammunition from the truck. He entered the home and shot his wife in the back of the head in the foyer of their home. The evidence showed that the victim was unarmed. Defendant then dragged the bleeding victim through the home and put her in the bathroom. Defendant then fled the home. He later called 911 and reported that the victim had fallen and hit her head on the toilet, an apparent effort to conceal the nature of the victim's injury. Defendant's actions also delayed emergency care being provided to the victim. The evidence showed that Defendant had previously threatened to harm the victim and that Defendant was aware at the time of the murder that the victim was in a relationship with another man and that the divorce proceeding was scheduled to be set for a final hearing. Defendant exhibited calmness after the shooting when a neighbor observed him walking away from the house in no apparent haste, and when he answered a phone call to the victim's cell phone from a coworker. Defendant told the coworker that the victim was running late for work and would be in shortly.

While Defendant presented expert testimony that he suffered from severe depression interfering with his ability to form intent, the State also presented an expert, who testified that Defendant's depression did not prevent him from being able to form the requisite mental state. It is the province of the jury to assess the credibility of the witnesses, weigh the evidence, and resolve disputed issues of fact. *State v. Leach*, 148 S.W.3d 42, 53 (Tenn. 2004).

We conclude that the evidence was sufficient to support a finding of premeditation, and therefore, the evidence was sufficient to sustain Defendant's conviction for first degree premeditated murder. Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE